## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INTEGRATED WASTE SOLUTIONS, | : | CIVIL ACTION |
| INC., D/B/A DUMPSTER SOURCE, | : | |
| dumpstersource.com, | : | |
| | : | |
| Plaintiff, | : | NO. 10-2155 |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SUDHAKAR GOVERDHANAM, PRIME | : | |
| TECHNOLOGY GROUP, INC., SERVICE | : | |
| DIRECT GROUP LLC, D/B/A DUMPSTER | : | |
| DIRECT, dumpsterdirect.com, & JOHN | : | |
| DOES 1-4, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                                 November 30, 2010

Presently before the Court is the Motion of Defendants Sudhakar Goverdhanam, Prime

Technology Group, Inc., and Service Direct Group LLC to Dismiss the Complaint of Plaintiff

Integrated Waste Solutions, Inc. pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6),

and 12(h)(3). For the following reasons, the Defendants' Motion to Dismiss is granted in part

and denied in part.

## I.      PROCEDURAL HISTORY

On May 11, 2010, Plaintiff Integrated Waste Solutions, Inc. ("Integrated Waste")

commenced this lawsuit based upon Defendants' alleged misappropriation of Plaintiff's

confidential business information. Defendants moved to dismiss Plaintiff's Complaint on May

22, 2010. Plaintiff then filed a Motion for Preliminary Injunction on June 23, 2010. On July 20, 2010, the Court entered a Stipulation and Order stating that, pursuant to the terms of the Order, neither Defendants nor their agents would use Plaintiff's confidential information. Plaintiff filed an Amended Complaint on July 22, 2010, which Defendants moved to dismiss on August 9, 2010. Plaintiff filed its Response on September 7, 2010, and later filed a Motion for Injunction and Permanent Sanctions on October 20, 2010. In this Opinion, the Court considers only the Motion to Dismiss and Plaintiff's Response.

## II.    FACTUAL BACKGROUND

Plaintiff Integrated Waste, headquartered in New Jersey with its principal place of business in West Chester, Pennsylvania, leases waste disposal containers and compactors to residential and commercial customers via a network of approved vendors. (Am. Compl. ¶ 9.) According to the facts of the Amended Complaint, Plaintiff has, over time, compiled a list of approximately 3,000 vendors offering dumpster-related services at Plaintiff-approved prices. (Id. ¶ 19.) In addition, Plaintiff has collected thousands of customers' "preferences, pricing histories, special needs and quirks, credit card numbers and accounts," in addition to local market information. (Id. ¶ 20.)

Plaintiff initially used "phonebook listings and advertising with no internet component" to carry out its business model. (Id. ¶ 23.) Several years ago, however, Mr. William Lowther, CEO of Integrated Waste, decided to move his business online in order to provide customers with a central system through which to seek Plaintiff-approved vendors. (Id. ¶ 26.) Consequently, Mr. Lowther began seeking an appropriate IT company to aid Integrated Waste in implementing this new business model. (Id. ¶ 6.)

2

## *Plaintiff's Alleged Contracts with Defendants Goverdhanam and Prime*

Mr. Lowther met Defendant Sudhakar Goverdhanam, CEO of Prime Technology, Inc.
("Prime") in 2006, when their daughters attended the same school. (Id. ¶ 27.) During casual
conversation, Defendant Goverdhanam suggested that Prime, a global IT consulting company
that developed specialized software for businesses, could aid Mr. Lowther in moving his
business online. (Id. ¶ 27.) According to the Amended Complaint, Goverdhanam represented to
Mr. Lowther that Prime could craft the customized computer systems and software necessary for
Plaintiff to launch its interactive online service. (Id. ¶¶ 27-28.) He stated that Prime's prices,
while likely reaching well into six figures, were significantly lower than those of its competitors
due to Goverdhanam's decision to outsource much of Prime's labor to its office in Hyderabad,
India. (Id. ¶ 29.) Defendant Goverdhanam allegedly failed to inform Plaintiff, however, that
Prime could also move Integrated Waste online using Plaintiff's existing computer systems and
software programs. (Id. ¶ 30.) This strategy, according to Plaintiff, would have been far more
efficient and inexpensive. (Id. ¶ 31.)

Prior to contracting with Prime, Mr. Lowther insisted Prime sign a Confidentiality and
Non-Disclosure Agreement. (Id. ¶ 32.) The Agreement prohibited Prime from using or
disclosing "any and all business rules, functional specifications, business, financial, or technical
information or data in any form or medium whatsoever, tangible or intangible." (Id. ¶ 33.)
Under the Agreement, "confidential business information" included "distribution methods,
customer lists, business rules, business plans, suppliers and vendors." (Id.) Such obligations
were to continue "even after any relationship with Integrated Waste had ended." (Id. ¶ 35.) By
insisting that Prime sign the Agreement, Lowther hoped to protect his company's customer and

3

vendor data, along with its "unique, proprietary system of business rules and functional specifications." (Id. ¶ 21.) According to Plaintiff, these items constituted its "most valuable business assets" and "represent[ed] the fruits of [Lowther's] years of toil, trial and error." (Id. ¶ 32.) Prime signed the Agreement on September 14, 2006. (Id. ¶ 33.)

Subsequently, Plaintiff signed a "detailed business proposal" with Defendant Prime on April 12, 2007. (Id. ¶ 37.) The alleged contract outlined the functional elements of Plaintiff's system, including the ability to generate purchase orders and contact vendors online.[1] (Id. ¶ 37.) In order to enable Prime to develop customized software for Plaintiff's business needs, Plaintiff provided the company with its confidential "business rules, functional specifications, business plan, customer and vendor information and manner and know-how in providing dumpster services." (Id.) Defendant Prime also required Plaintiff to provide, at its own cost, "a designated project coordinator, and a business analyst and product manager to interface with Prime Technology and respond to all of Prime Technology's questions and suggestions." (Id. ¶ 39.)

### *Defendants' Alleged Breach of the Confidentiality Agreement and Contract*

Though Plaintiff complied with Defendant Prime's requirements, Prime allegedly failed to meet either the contract's proposed budget (between $117,000 and $136,240) or deadlines. (Id. ¶¶ 39-42.) Unable to carry out the original contract, Defendants Goverdhanam and Prime proposed a series of "contractual enhancements," which increased Plaintiff's final cost to $241,000. (Id. ¶ 40.) Plaintiff alleges that these "enhancements" merely eliminated important functions of Plaintiff's online service, such as the ability of a customer to electronically schedule

---

[1] Paragraph 37 of the Amended Complaint further describes Defendants' alleged contractual duties.

a dumpster pick-up date. (Id. ¶ 44.) Despite these modifications, Plaintiff claims Prime was ultimately unable to provide Plaintiff with a fully operational online system. (Id. ¶ 45.) Consequently, "Plaintiff's online presence was essentially reduced in functionality to an internet billboard, requiring that Integrated Waste perform manually essentially all of the business functions of its dumpster services business." (Id. ¶ 46.) The system was allegedly so defective that, in October 2008, Plaintiff was forced to hire another entity, Rapid Business Solutions, Inc., ("RBS") to launch its online business. (Id. ¶ 47.) RBS did so successfully (Plaintiff now operates online as dumpstersource.com), though at an additional cost to Plaintiff of $304,316.38. (Id. ¶ 48.) According to Plaintiff, had Defendant Prime fulfilled its contractual obligations, it would have saved hundreds of thousands of dollars and benefitted from an internet-based presence one year earlier. (Id. ¶ 49.)

Despite Defendant Prime's alleged failure to fulfill its contractual obligations, in 2009, Defendant Goverdhanam offered to supply an internal development team for Plaintiff's internet business and supporting systems. (Id. ¶ 50.) Plaintiff declined, and now believes that Goverdhanam made such an offer to obtain continuing access to Plaintiff's confidential information. (Id.)

### *Plaintiff's Discovery of Defendants' Alleged Illegal Conduct*

In fall of 2009, Plaintiff learned from a website tracking service that dumpstersource.com "was being cyber-attacked by thousands of first weekly then daily hits, all originating from Hyderabad and Delhi, India." (Id. ¶ 16.) Plaintiff does no business in India. (Id. ¶ 53.) According to Plaintiff, these attacks aimed to obtain Plaintiff's pricing and vendor information by zip code, track changes Plaintiff made to its business rules, and access Plaintiff's confidential

information. (Id. ¶ 54.) The attacks allegedly pierced Plaintiff's firewall to access data stored in Plaintiff's back-end software systems "both before and after transmission to Plaintiff's customers, vendors, employees, and professionals providing services to and from Plaintiff." (Id. ¶ 54.)

Soon after these attacks began, Mr. Lowther learned from Defendant Goverdhanam that Prime was struggling, and that Goverdhanam was considering selling the entity. (Id. ¶ 57.) Thereafter, Plaintiff learned that Defendant Prime had been in financial trouble during the time it was servicing Plaintiff. (Id. ¶ 58.) During Mr. Lowther's conversation with Defendant Goverdhanam, Goverdhanam also announced that he had obtained $2 million from Wall Street investors to start an internet-based business, Defendant Service Direct Group LLC ("Service Direct"). (Id. ¶ 59.) Goverdhanam described the business as one that connected waste management customers with pre-approved vendors. (Id.) Upon further research, Plaintiff learned from records on file with the Delaware Corporate Authorities that Service Direct had two members, Sudhakar Goverdhanam and his wife, Rabika Gullapalli; that its registered address leads to a post office drop from which mail is forwarded to Prime's principal place of business; and that Service Direct is doing business online as Dumpster Direct at dumpsterdirect.com. (Id. ¶ 61.) According to Plaintiff, dumpsterdirect.com offers dumpster services identical to those of Plaintiff's dumpstersource.com. (Id. ¶ 64.) Plaintiff further avers that the entity uses the "same business rules, business plan, and screen concepts that Defendants had purloined from Plaintiff," and the same business model Integrated Waste had provided to Prime under the Confidentiality Agreement. (Id.)

Based on these alleged findings, Plaintiff claims that Defendant Goverdhanam induced

6

Plaintiff into giving him proprietary business information with the intent of using that information to launch a competing business. (Id. ¶ 66.) Moreover, Plaintiff claims that Defendant Goverdhanam's office in Hyderabad, India is behind the aforementioned "cyber-attacks" against Plaintiff's website. As a result, Plaintiff's Amended Complaint alleges the following claims: (1) breach of contract against Prime; (id. ¶¶ 70-77) (2) injunction against Prime and Goverdhanam (id. ¶¶ 78-84); (3) unjust enrichment against Prime and Dumpster Direct (id. ¶¶ 85-92); (4) conversion against Prime and Dumpster Direct (93-101); (5) fraud against Goverdhanam (id. ¶¶ 102-13); (6) breach of contract against Prime (id. ¶¶ 114-24); (7) fraud and intentional misrepresentation against Goverdhanam (id. ¶¶ 125-35); (8) negligent misrepresentation against Goverdhanam (id. ¶¶ 136-46); (9) civil conspiracy against Goverdhanam and four unidentified Defendants (id. ¶¶ 147-55); (10) unlawful access to stored communications pursuant to 18 U.S.C. § 2707(a) against Prime, Service Direct, and Goverdhanam (id. ¶¶ 156-70); (11) fraud and related activity in connection with computers pursuant to 18 U.S.C. § 1030(a)(g) against Prime, Goverdhanam, and Dumpster Direct (id. ¶¶ 171-80); and (12) violating the Pennsylvania Uniform Trade Secrets Act against Prime, Goverdhanam, and Dumpster Direct. (Id. ¶¶ 181-99.)

Plaintiff contends that this Court has federal question jurisdiction over its Stored Communications Act and Computer Fraud and Abuse Act claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over its state law claims pursuant to 28 U.S.C. § 1367. Defendants request that the Court dismiss Plaintiff's federal actions for failure to state a claim, and that Plaintiff's remaining state law claims be dismissed for lack of subject matter jurisdiction. In the alternative, Defendants argue that the Court should dismiss Counts III (unjust enrichment), IV

7

(conversion), V (fraud), VII (fraud and intentional misrepresentation), VIII (negligent misrepresentation), and IX (civil conspiracy) based on the "gist of the action" doctrine. The Court will consider these arguments in turn.

## III.    STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. The Court emphasized that it would not require a "heightened fact pleading of specifics," but only "enough facts to state a claim to relief that is plausible on its face." Id. at 570.

In the subsequent case of Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), the Court enunciated two fundamental principles applicable to a court's review of a motion to dismiss for failure to state a claim. First, it noted that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1949. Thus, although "[Federal] Rule [of Civil Procedure] 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 1950. Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives

a motion to dismiss." Id. The task of determining whether a complaint states a plausible claim for relief is "context-specific," and "requires the reviewing court to draw on its judicial experience and common sense." Id. The Supreme Court explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Id. at 1949 (citing Twombly, 550 U.S. at 556-57); see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (adopting Iqbal's standards).

Notwithstanding the foregoing, many of the fundamental underpinnings of Rule 12(b)(6) still stand. Arner v. PGT Trucking, Inc., No. CIV.A.09-565, 2010 WL 1052953, at *2 (W.D. Pa. Mar. 22, 2010); Spence v. Brownsville Area Sch. Dist., No. CIV.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. Jul. 15, 2008). Federal Rule of Civil Procedure 8 requires only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. FED. R. CIV. P. 8; Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

Defendant also moves for dismissal pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3). Under Rules 12(b)(1) and 12(h)(3), the Court must dismiss a complaint when it lacks subject matter jurisdiction over an action. FED. R. CIV. P. 12(b)(1), 12(h)(3). There are two

9

types of Rule 12(b)(1) challenges – facial and factual. <u>Turicentro, S.A. v. Am. Airlines, Inc.</u>, 303 F.3d 293, 300 (3d Cir. 2002); <u>Nelson v. Commw. of Pa. Dept. of Pub. Welfare</u>, 244 F. Supp. 2d 382, 386 (E.D. Pa. 2002). In a facial attack on subject matter jurisdiction, the moving party challenges the Court's jurisdiction based solely on the complaint, and "the court must accept the complaint's allegations as true." <u>Turicentro</u>, 303 F.3d at 300. "In contrast, a trial court considering a factual attack accords plaintiff's allegations no presumption of truth. . . . [and] must weigh the evidence relating to jurisdiction, with discretion to allow affidavits, documents, and even limited evidentiary hearings." <u>Id.</u>

In the instant action, Defendants make no specific argument as to subject matter jurisdiction; rather, Defendants challenge the factual sufficiency of Plaintiff's pleadings. Accordingly, Defendant's challenge is facial, and the Court will accept all of Plaintiff's allegations as true when determining whether or not the Court has subject matter jurisdiction over the case.

## IV.     DISCUSSION

### A.     <u>Whether Plaintiff has Stated a Claim under the Stored Communications Act</u>

The Stored Communications Act ("SCA"), also known as Title II of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2701-2712, prohibits unauthorized access of an electronic communication while it is in "electronic storage" in a "facility through which an electronic communication service is provided." 18 U.S.C. § 2701(a). The statute defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by wire, radio, electronic, photoelectronic or photoptical system that affects interstate or foreign commerce." <u>Id.</u> §

10

2510(12); see also id. § 2711 (incorporating the definitions of § 2510 into the SCA). "Electronic storage" includes any temporary, immediate storage of an electronic communication that is incidental to its transmission, as well as "storage of such communication by an electronic communication service for purposes of backup protection." Id. § 2510(17). An "electronic communications service" is "any service which provides to users thereof the ability to send or receive wire or electronic communications." Id. § 2510(15).

In Count X, Plaintiff alleges that Defendants Goverdhanam, Prime Technology, and Service Direct violated the Stored Communications Act by "deliberately exceed[ing] the authorized use of access to Plaintiff's electronically stored Confidential Information" and launching daily "cyber-attacks" on Plaintiff's website to further access proprietary information. (Am. Compl. ¶¶ 156-70.) In response, Defendants contend that Plaintiff has "fail[ed] to identify a single 'electronic communication' that [D]efendants allegedly accessed." (Defs.' Mot. Dismiss 3.) Defendants argue that an electronic communication, by definition, "require[s] that . . . data is being transferred," whereas Plaintiff merely alleges that Defendants accessed information in ordinary storage on Plaintiff's server. (Id. at 7.)

The SCA prohibits access to only two forms of stored electronic communications: (1) "communications temporarily stored by electronic communications services incident to their transmission" – for example, when "an email service stores a message until the addressee downloads it," In re Doubleclick, Inc., 154 F. Supp. 2d 497, 512 (S.D.N.Y. 2001); and (2) data stored for purposes of "backup protection" pending delivery to a recipient. 18 USC § 2510(17). Despite the SCA's narrow scope, the Court finds that Plaintiff has alleged access to a stored communication within the meaning of the Act. Plaintiff describes its online business as a fully

11

"interactive" enterprise where customers and other authorized users log in to access protected business data, place orders, and contact vendors. (Am. Compl. ¶¶ 28, 37.) Plaintiff further alleges that Defendants' purported "cyber-attacks" have pierced the firewall of Plaintiff's "electronic communication service system"[2] to access data stored on Plaintiff's server "both before and after transmission to Plaintiff's customers, vendors, employees and professional providing services to and for Plaintiff." (Am. Compl. ¶ 167.) Though SCA jurisprudence is still developing, courts have held that information stored on a secure website accessed by third-party users may qualify as a type of protected "communication" under the SCA. See Konop v. Hawaiian Airlines, Inc., 302 F.3d 868, 876 (9th Cir. 2002) (finding that the contents of secure websites are 'electronic communications' within the meaning of the SCA); Steve Jackson Games, Inc. v. U.S. Secret Service, 36 F.3d 457, 462-64 (5th Cir. 1994) (applying SCA to communications stored but not yet read by users of a subscription-only website); Kaufman v. Nest Seekers, LLC, No. CIV.A.05-6782, 2006 WL 2807177, at *7 (S.D.N.Y. Sept. 26, 2006) (finding plaintiff had sufficiently alleged access to a stored communication to where defendants hacked into real estate website providing confidential listings, customer information, and communications services to subscribers). Without delving into the operational intricacies of Plaintiff's website (a task inappropriate for this stage of pleading), the Court finds that such allegations, taken as true, raise a reasonable inference that Defendants accessed confidential information incidental to its transfer to authorized users of Plaintiff's site – not simply data stored on Plaintiff's computers. These allegations, though notably vague, are enough to fulfill

---

[2] For purposes of this Motion, Defendants do not challenge that Plaintiff's server constitutes a "facility through which an electronic communication service is provided." 18 U.S.C. § 2701(a).

12

Plaintiff's burden under <u>Twombly</u> and Rule 12(b)(6).

The same does not hold true for Defendants' alleged unauthorized use of electronically-stored Confidential Information while under contract with Plaintiff. Notwithstanding the fact that Defendants were allegedly authorized to access this information, <u>see, e.g.</u>, <u>Ideal Aerosmith, Inc. v. Acutronic USA, Inc.</u>, No. CIV.A.07-1029, 2007 WL 4394447, at *7 (E.D. Pa. Dec. 13, 2007) (finding that the SCA prohibits unauthorized *access*, but not unauthorized *use* of stored communications), the facts allege, at most, that Defendants exceeded their authorized access to proprietary information in ordinary storage on Plaintiff's computers. (Am. Compl. ¶¶ 38, 163.) Such allegations fail to suggest the existence of a stored communication within the meaning of the SCA.

Defendants also contend that the SCA only bars access "occurring *prior to* transmission of such communications." (Defs.' Mot. Dismiss 3.) (emphasis added). According to Defendants, unauthorized access to data stored on Plaintiff's server does not constitute pre-transmission access. (<u>Id.</u> at 7.) In response, Plaintiff correctly notes that some courts, including the Third Circuit, have suggested that the SCA may even extend to back-up protection of post-transmission data. <u>See</u> <u>Fraser v. Nationwide Mut. Ins. Co.</u>, 352 F.3d 107, 114 (3d Cir. 2003) ("assuming without deciding" that an email retrieved by an employer from storage on the company's server after transmission to a recipient constituted "backup protection" of an electronic communication subject to the SCA); <u>Markert v. Becker Tech. Staffing, Inc.</u>, No. CIV.A.09-5774, 2010 WL 1856057, at *6 (E.D. Pa. May 7, 2010) (finding, based on the Third Circuit's "nod in that direction" in <u>Fraser</u> and "this Court's own plain-language reading of the statute," that the SCA "applies when information is retrieved from electronic storage even after

13

transmission is complete"); see also Theofel v. Farey-Jones, 359 F.3d 1066, 1075-77 (9th Cir. 2004) (holding that a previously accessed email constituted "back-up protection" because such a message "functions as a 'backup' for the user"). The Court need not join the debate over post-transmission storage at this stage of the proceedings, however. As discussed above, the Court finds that Plaintiff's allegations, taken as true, suggest access to stored communications on a secure website both pre- *and* post-transmission. Accordingly, the Court will allow Plaintiff's SCA claim to proceed to the extent it relies upon Defendants' unauthorized access to communications stored on Plaintiff's secure website server.

## B.     Whether Plaintiff has Stated a Claim under the Computer Fraud and Abuse Act

Plaintiff also asserts that Defendants Goverdhanam, Prime, and Service Direct's unauthorized use of Plaintiff's confidential information, in addition to Defendants' ongoing cyber-attacks against Plaintiff's website, have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* ("CFAA"). To bring a claim pursuant to § 1030(a)(4) of the CFAA, a plaintiff must allege: (1) that the defendant has accessed a "protected computer"; (2) has done so without authorization or by exceeding such authorization as was granted; (3) has done so "knowingly" and with "intent to defraud"; and (4) as a result has "further[ed] the intended fraud and obtain[ed] anything of value." 18 U.S.C. § 1030(a)(4).

Defendants first argue that Plaintiff has neither alleged the existence of a "protected computer" nor access "without authorization." (Defs.' Mot. Dismiss 8.) Under the CFAA, a "protected computer" is one "[w]hich is used in interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B). Such devices include "any data storage facility or

14

communications facility directly related to or operating in conjunction with" a computing system. Id. § 1030(e)(1).

Contrary to Defendants' assertions, the Court finds that Plaintiff has adequately pled the first two elements of the Act with respect to Defendants' alleged "cyber-attacks." According to the Amended Complaint, Plaintiff's site receives thousands of daily hits originating from Hyderabad, India, where Defendant Prime has an office to which it outsources much of its work. (Am. Compl. ¶¶ 29, 53.) Plaintiff alleges that these attacks aimed to "pierce the firewall of Plaintiff's electronic communications system" in order to "enter and access the behind the screen, back-end computer systems and software programs and data stored and available on Integrated Waste's server." (Am. Compl. ¶ 167.) Plaintiff further avers that its online business, which relies upon the aforementioned computer systems, serves customers nationwide. (Id. ¶ 19.) Such facts sufficiently allege the existence of a protected computer system used in interstate commerce. Similarly, Plaintiff's allegations of Defendants' "cyber-attacks," taken as true, are clearly unauthorized. Thus, Plaintiff has fulfilled the first two prongs of the CFAA.

To the extent, however, that Plaintiff relies upon Defendants' alleged misuse of information to which they had access via the Confidentiality Agreement, the claim fails. The CFAA defines "exceeds authorized access" as accessing a computer "without authorization" and using "such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." Id. § 1030(e)(6). Similar to the the SCA, the CFAA prohibits unauthorized *access* to information rather than unauthorized *use*. Though the Third Circuit has yet to address the meaning of "exceeds authorized access," courts in this district have held, in the employer-employee context, that "an employee who may access a computer by the terms of his

15

employment is 'authorized' to use that computer for purposes of [the] CFAA even if his purpose in doing so is to misuse or misappropriate the employer's information." Bro-Tech Corp. v Thermax, Inc., 651 F. Supp. 2d 378, 407 (E.D. Pa. 2009); see also LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1133 (9th Cir. 2009) (holding that "without authorization" means "without permission").[3] Here, the Amended Complaint alleges only that Defendants induced Plaintiff by fraudulent means to provide them with access to confidential information, which Defendants then misappropriated for their own purposes. (Am. Compl. ¶ 8.) Such behavior does not indicate lack of authorization, and therefore does not fall within the purview of the CFAA.

Next, Defendants argue that Plaintiff has not alleged cognizable damages. (Defs.' Mot. Dismiss 10.) To state a claim under § 1030(a)(4) of the CFAA, a plaintiff must allege loss exceeding $5,000. 18 U.S.C. § 1030(a)(4); id. § 1030(a)(5)(B)(i); P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC, 428 F.3d 504, 512 (3d Cir. 2005). The statute defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other

---

[3] The First and Seventh Circuits, along with a number of district courts, have concluded that, under agency law principles, an employee can "exceed authorized access" within the meaning of the CFAA by using confidential information the employee is authorized to access "in a manner inconsistent with the duty of loyalty to the employer." Bro-Tech Corp., 651 F. Supp. 2d at 407 (citing Int'l Airport Ctrs., LLC v. Citrin, 440 F.3d 418, 420-21 (7th Cir. 2006); Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1125 (W.D. Was. 2000)). Using this logic, some courts have found that the agency relationship (and therefore the rights of access) terminate when the employee "acquires adverse interests . . . to the principal." Int'l Airport Ctrs, 440 F.3d at 421. Without further scrutinizing the relationship between Plaintiff and Defendant Prime to determine the applicability of agency principles to the case at hand, we decline to apply this view based on the weight of contrary authority from within the Court's own Circuit.

16

consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

Plaintiff alleges that it has paid more than $5,000 thus far to "retain[] specialized services that report and record the cyber-attacks and their origins, and for security enhancements to Plaintiff's computer systems." (Am. Compl. ¶ 179.) The Court finds that these costs, incurred in the course of assessing and responding to alleged violations of the CFAA, constitute cognizable damages under the Act. To that end, Defendants have misread Advantage Ambulance Group, Inc. v. Lugo, No. CIV.A.08-3300, 2009 WL 839085 (E.D. Pa. Mar. 30, 2009) for the proposition that Plaintiff's failure to specify a precise amount of damages in their Amended Complaint renders them "unable to meet their pleading burden." (Defs.' Mot. Dismiss 10.) In Advantage Ambulance, the plaintiff named damages only in the form of lost revenue due to former employees' transfer of the plaintiff's trade secrets to their new employers. 2009 WL 839085, at *4. Based on the plaintiff's failure to identify "any measures [that] had to be taken to remedy any damage done to protect their computer system or to protect themselves from having this alleged injury occur again in the future," the court found these damages too speculative to constitute loss contemplated by the CFAA. Id. In contrast, Plaintiff in the instant case has listed the increasing costs of steps it has already begun taking to remedy the harm these alleged attacks have caused. Thus, Plaintiff has pled sufficient damages for the purposes of the Act.

Defendants also argue that Plaintiff has failed to identify the IP address of the computers allegedly accessed or the persons who purportedly accessed the computers, the dates of access, or the information accessed. (Defs.' Mot. Dismiss 9.) Defendants have failed, however, to cite any authority naming these factors as essential to a CFAA claim. Moreover, contrary to Defendants' contentions, Plaintiff has stated the location of the data accessed (Plaintiff's internal server),

dates of access (daily), and the information accessed (confidential customer data and other business information stored on Plaintiff's server). Accordingly, the Court finds that Plaintiff has stated a plausible claim under the CFAA, and thus denies Defendants' Motion for dismissal of this claim.

## C. Whether the "Gist of the Action" Doctrine Applies to Plaintiff's State Law Tort Claims

Given that the Court has allowed Plaintiff's federal claims to proceed, the Court may exercise supplemental jurisdiction over Plaintiff's remaining state law claims pursuant to 28 U.S.C. § 1367. With respect to Plaintiff's state law tort claims, Defendants argue that the Court should dismiss Counts III (unjust enrichment), IV (conversion), V (fraud), VII (fraud and intentional misrepresentation), VIII (negligent misrepresentation), and IX (civil conspiracy) because they are redundant of Plaintiff's contract claims and therefore precluded by the "gist of the action" doctrine.

Under Pennsylvania law,[4] the "gist of the action" doctrine "maintain[s] the conceptual distinction between breach of contract claims and tort claims. . . . [by] preclud[ing] plaintiffs from recasting ordinary breach of contract claims into tort claims." eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002).[5] The simple existence of a contractual

---

[4] In a footnote in Plaintiff's Response, Plaintiff suggests that, because Integrated Waste is incorporated in New Jersey and Defendants Prime and Service Direct are incorporated in Delaware, Pennsylvania law may not apply to the issues at hand. Plaintiff offers no subsequent choice of law analysis and proceeds to argue under principles of Pennsylvania law. Absent any additional factual showings from either side of what other state's law might apply, the Court assumes, for purposes of this opinion, that Pennsylvania law controls.

[5] Although the Pennsylvania Supreme Court has not explicitly adopted the gist of the action doctrine, both the Pennsylvania Superior Court and multiple United States District Courts have predicted that it will. Woods v. ERA Med LLC, No. CIV.A.08-2495, 2009 WL 141854, at

18

relationship between two parties does not preclude one party from bringing a tort claim against the other. Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 104 (3d Cir. 2001). The doctrine does, however, foreclose a party's pursuit of a tort action for the mere breach of contractual duties without any separate or independent event giving rise to the tort. Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co., 256 F. Supp. 2d 329, 340 (E.D. Pa. 2003).

"When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort." Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999). To make this determination, the court must ascertain the source of the duties allegedly breached. Sunburst Paper, LLC v. Keating Fibre Int'l, Inc., No. CIV.A.06-3959, 2006 WL 3097771, at *2 (E.D. Pa. Oct. 30, 2006). The doctrine bars tort claims: "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." eToll, 811 A.2d at 19 (citations and quotations omitted). "In other words, if the duties in question are intertwined with contractual obligations, the claim sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort." Sunburst Paper, 2006 WL 3097771, at *2. Whether the gist of the action doctrine applies in any particular setting is a question of law. Bohler-Uddeholm, 247 F.3d at 103.

---

*6 n.11 (E.D. Pa. Jan. 21, 2009) (citing cases).

## 1. **Fraud, Intentional Misrepresentation, and Negligent Misrepresentation Claims**

Pennsylvania courts have long debated whether the gist of the action doctrine applies to a cause of action for fraud. Under Pennsylvania law, the elements of a fraud or intentional misrepresentation claim include: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." Giordano v. Claudio, 714 F. Supp. 2d 508, 518 (E.D. Pa. 2010).[6] A claim for fraudulent inducement requires, in addition to the foregoing elements, that the misrepresentation was made with the specific intent to induce another to enter into a contract when the person had no duty to enter into the contract. In re Allegheny Int'l, Inc., 954 F.2d 167, 178 (3d Cir. 1992).

The Pennsylvania Superior Court has explicitly recognized that Pennsylvania law has "not carved out a categorical exception for fraud, and [has] not held that the duty to avoid fraud is always a qualitatively different duty imposed by society rather than by the contract itself." eToll, 811 A.2d at 19. Even so, courts have consistently suggested that claims of fraudulent inducement tend to be "collateral to (*i.e.,* not 'interwoven' with) the terms of the contract itself." Id. at 17. In contrast to claims of fraudulent performance, those of fraudulent inducement are "much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists." Air Prods. & Chems., 256 F. Supp. 2d at 341.

---

[6] Pennsylvania courts do not distinguish between causes of action for fraud and intentional misrepresentation. Giordano, 714 F. Supp. 2d at 518 (citing Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. Super. Ct. 1994).

20

Even this distinction, however, does not establish a bright line rule. Where the pre-contractual statements that are the basis for the fraudulent inducement claim concern specific duties that the parties later outlined in the alleged contract, courts have repeatedly dismissed such claims as sounding in contract and, thus, barred by the gist of the action doctrine. See, e.g., Williams v. Hilton Grp., PLC, 93 Fed. Appx. 384, 386-87 (3d Cir. 2004) (concluding that where defendants induced plaintiffs into committing to buying gaming assets for a certain price on an exclusive basis while secretly marketing properties to other buyers, the gravamen of the fraud in the inducement claim sounded in contract and was barred by the gist of the action doctrine); De Lage Landen Fin. Servs., Inc. v. Barton Nelson, Inc., No. CIV.A.08-0530, 2008 WL 4791891, at *6-7 (E.D. Pa. Nov. 4, 2008) (dismissing fraudulent inducement claim where the alleged pre-contractual misrepresentations were directly addressed by the written contract); Tier1 Innovation, LLC v. Expert Tech. Group, LP, No. CIV.A.06-4622, 2007 WL 1377664, at *4 (E.D. Pa. May 8, 2007) (dismissing allegations of fraud in the inducement and negligent misrepresentation on grounds that they were "inextricably intertwined" with the alleged failure to perform under the contract, as the claims pertained to representations regarding a party's ability to perform its duties under the agreement); Penn City Invs., Inc. v. Soltech, No. CIV.A.01-5542, 2003 WL 22844210, at *3-5 (E.D. Pa. Nov. 25, 2003) (dismissing, on summary judgment, fraudulent inducement claim based on pre-contractual discussions regarding specific duties that were directly addressed by the written contract).

Plaintiff's fraud, intentional misrepresentation, and negligent misrepresentation claims allege that Defendant Goverdhanam induced Plaintiff into "providing Confidential Information to and thereafter entering into contracts with Prime Technology" by making "express and implied

21

representations" that he would "comply with the Confidentiality Agreement and . . . ensure that his corporation would faithfully perform [the] services" outlined in Prime's subsequent contract with Integrated Waste. (Am. Compl. ¶¶ 109, 111.) Plaintiff avers that, contrary to these representations, Defendant Goverdhanam "intentionally and willfully violat[ed] each of the obligations he assumed for Prime Technology under the Confidentiality Agreement." (Id. ¶ 104.) These alleged violations include: (1) Prime's intentional failure to fulfill its duties under the service contract in an effort to buy time to steal Plaintiff's proprietary business information, and (2) Goverdhanam's use of this proprietary information, along with the computer platforms Plaintiff had paid Prime to create, to launch a competing online dumpster services business. (Id. ¶¶ 104-05, 107.) For each count, Plaintiff seeks compensatory damages in excess of $1 million, in addition to appropriate punitive damages. (Id. ¶ 113.) Plaintiff avers the same underlying facts for its negligent misrepresentation claim, but characterizes Defendant Goverdhanam's misrepresentations as, "[i]f not fraudulent . . . reckless, careless, and/or negligently made." (Id. ¶ 146.)

The Court finds that Defendant Goverdhanam's duty not to misappropriate Plaintiff's confidential information was entirely embodied in the terms of the Confidentiality Agreement. According to the Amended Complaint, the Confidentiality Agreement "[a]cknowledged that Integrated Waste retained all right, title and interest in and to the Confidential Information, including all Intellectual Property," and "obligated Prime Technology to receive and hold the Confidential Information solely for the purpose of its relationship with Integrated Waste." (Id. ¶¶ 34-35.) The parties "[s]pecifically agreed that at no time and under no circumstance would Prime Technology reverse-engineer, decompile, create other works from, or disassemble any part

22

of the Confidential Information." (Id. ¶ 35.) This Agreement extended to "any contract between the parties for the provision of goods and services which might occur thereafter." (Id. ¶ 35.) Plaintiff's claims are thus redundant of its breach of contract claims, which arise from the same conduct (misappropriation of Plaintiff's proprietary business information in breach of the Confidentiality Agreement) and request the same damages (compensatory and punitive damages in excess of $1 million). (Id. ¶¶ 72-77.)

Similarly, Defendant Goverdhanam's purported misrepresentations that Prime planned to perform its obligations under the alleged service contract are not enough to transform a claim for failure to perform into one of fraud. Courts have consistently rejected attempts to "bootstrap" a contract claim into a fraud claim "merely by adding the words 'fraudulently induced' or alleging the contracting parties never intended to perform." Galdieri v. Monsanto Co., 245 F. Supp. 2d 636, 650 (E.D. Pa. 2002); see also Williams v. Hilton Grp., PLC, 261 F. Supp. 2d 324, 330 (W.D. Pa. 2003) ("Adding the words 'falsely' and 'negligently' to the representations made in the course of reaching an agreement . . . or alleging misconduct occurring during its performance or ulterior motive in inducing the agreement, does not convert what is essentially a contract action into a fraud or negligence claim."); eToll, 811 A.2d at 20 (barring fraud claim pursuant to gist of the action doctrine where defendant allegedly "concealed . . . schemes" in order to continue breaching contract). Thus, just as Plaintiff's breach of contract claims may fully recompense Plaintiff for any harm suffered due to Defendant Goverdhanam's alleged misrepresentations concerning his intent to comply with the Confidentiality Agreement, so, too, do they encapsulate Defendants' failure – intentional or not – to perform under the alleged service contract.

23

Moreover, the Court finds that the gist of the action doctrine applies to Plaintiff's claims against Defendant Goverdhanam, despite the fact that Plaintiff's breach of contract actions are against Defendant Prime only. As Defendants note, "the gist of the action doctrine bars tort claims against an individual defendant where the contract between the plaintiff and the officer's company created the duties that the individual allegedly breached." Williams, 93 Fed. Appx. at 387. Here, Goverdhanam clearly acted as his own company's chief negotiator, and his misrepresentations were based on his intent (or lack thereof) to comply with, or have his company comply with, the terms of the Confidentiality Agreement and subsequent service contract. Id. (applying gist of the action doctrine to fraud claims against negotiator of contract for misrepresentations made during negotiating process concerning matters later embodied in Letter of Intent). Given that the alleged contracts between the parties governed the subject matter of Defendant Goverdhanam's purported misrepresentations, Goverdhanam's lack of contractual relationship with Plaintiff does not preclude the Court's application of the gist of the action doctrine.

Plaintiff encourages the Court to follow the logic of Sands v. Wagner, 314 Fed. Appx. 506 (3d. Cir. 2009) and Padalino v. Standard Fire Insur. Co., 616 F. Supp. 2d 538 (E.D. Pa. 2008), where the courts refused to apply the gist of the action doctrine to claims of fraudulent inducement. The Court finds these cases distinguishable from the one at hand, however. In Sands, the court found that the doctrine did not bar plaintiff's fraud claim because "[t]he duties allegedly breached . . . ex[t]end[ed] well beyond the terms" of the contract between the parties. Sands, 314 Fed. Appx. at 507-08. There, the breach of contract claim arose from a defendant's failure to pay the plaintiff pursuant to the terms of the parties' agreement, whereas the fraud

claim concerned an unlawful agreement between that defendant and another defendant to start a competing business. Id. Unlike the fraud claim in Sands, Plaintiff's breach of contract, fraud, and misrepresentation claims all relate to Defendant Goverdhanam's alleged failure to comply with the terms specifically outlined in the Confidentiality Agreement and subsequent service contract. Therefore, Defendants' conduct in the case at bar did not, in the words of the Sands court, "ex[t]end well beyond the terms" of the contracts between the parties.

In Padalino, 616 F. Supp. 2d 538 (E.D. Pa. 2008), the plaintiffs sued an insurance company for fraud, negligent misrepresentation, and breach of oral contract, alleging that the company's agent induced the plaintiffs to buy and insure property that the defendant should have known was ineligible for coverage under federal law. There, the court held that the gist of the action doctrine did not bar the plaintiff's fraud and misrepresentation claims because "breach of contract claims and fraud in the inducement claims are not redundant." Id. at 550. The court did not address, however, the wealth of authority holding that the doctrine *does* apply to misrepresentations concerning specific duties the parties later outlined in their contracts. Consequently, this Court chooses not to follow the Padalino court's analysis.

The Court acknowledges that it must exercise caution in making a determination regarding the "gist of the action" doctrine at this early stage of the case. See, e.g., Weber Display & Packaging v. Providence Wash. Ins. Co., No. CIV.A.02-7792, 2003 WL 329141, at *4 (E.D. Pa. Feb. 10, 2003). The Court finds, however, that Plaintiff's claims of fraud, intentional misrepresentation, and negligent misrepresentation are derived from duties the parties specifically outlined in their subsequent agreements. Thus, the claims merely duplicate

25

Plaintiff's breach of contract claims, and are therefore barred by the gist of the action doctrine.[7]

## 2. **Conversion Claim**

In Count IV, Plaintiff asserts a claim for conversion against Defendants Prime and Service Direct, averring that these Defendants have "usurped Plaintiff's Confidential Information" without consent and "derived significant revenue and profits" from this information by creating a competing business. (Am. Compl. ¶¶ 96-97.)

Conversion is defined as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." Leonard A. Feinberg, Inc. v. Cent. Asia Capital Corp., Ltd., 974 F. Supp. 822, 844-45 (E.D. Pa. 1997) (citation omitted). Although "[t]he mere existence of a contract between the parties does not automatically foreclose the parties from raising a tort action[,] . . . a party cannot prevail on its action of conversion when the pleadings reveal merely a damage claim for breach of contract." Neyer, Tiseo & Hindo, Ltd. v. Russell, No. CIV.A.92-2983, 1993 WL 53579, at *4 (E.D. Pa. Mar. 2, 1993) (internal citations omitted). Accordingly, courts have dismissed conversion claims under the gist of the action doctrine where the alleged entitlement to the chattel arises solely from the contract between the parties. Montgomery v. Fed. Ins. Co., 836 F. Supp. 292, 301-02 (E.D. Pa. 1993) (dismissing conversion claim because of, *inter alia,* the "firmly accepted . . . doctrine that an action for conversion will not lie where damages asserted are essentially damages for breach of contract"); Pittsburgh Constr. Co. v. Griffith, 834 A.2d 572, 584 (Pa. Super. Ct. 2003) (stating that where success of the conversion claim "depend[s] entirely on the obligations as

---

[7] Given that the Court has dismissed the fraud and misrepresentation claims against Defendant Goverdhanam, it need not address Defendants' alternative argument concerning Goverdhanam's lack of personal liability for these claims. (Defs.' Mot. Dismiss 12-13.)

26

defined by the contract," the "gist of the action" doctrine applies).  Notably, however, "[w]hen a plaintiff has a property interest in the thing that is the subject of a [conversion] claim, the gist of the action doctrine does not bar recovery under a conversion theory even though the property may also be the subject of a contract."  Orthovita, Inc. v. Erbe, No. CIV.A.07-2395, 2008 WL 423446, at *6 (E.D. Pa. Feb. 14, 2008) (citing Berger & Montague v. Scott & Scott, 153 F. Supp. 2d 750, 753-54 (E.D. Pa. 2001) (holding that conversion claim was not barred when plaintiff had property interest in proceeds that were both the subject of the breach of contract and conversion claims)).

The Court finds that Plaintiff has sufficiently alleged a property interest in its confidential business information for the purposes of the conversion claim.  Throughout the Amended Complaint, Plaintiff avers that its confidential customer lists, vendor lists, and market research "represent[] the fruits of [Plaintiff's] years of toil, trial, and error."  (Am. Compl. ¶ 32.)  The Third Circuit has explicitly stated that "[c]onfidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit."  U.S. v. Al Hedaithy, 392 F.3d 580, 594 (3d Cir. 2004) (quoting Carpenter v. U.S., 484 U.S. 19, 26 (1987)).  Therefore, despite the fact that Plaintiff's proprietary information is the subject of the Confidentiality Agreement between the parties, the Court finds the gist of the action doctrine inapplicable to Plaintiff's conversion claim.  Accordingly, the Court denies Defendants' Motion to Dismiss this claim.

### 3.  Unjust Enrichment Claim

In Count III, Plaintiff brings a claim for unjust enrichment against Defendants Prime Technology and Dumpster Direct for "deriv[ing] signficant revenue and profits from the

27

Confidential Information and business model they have purloined from Plaintiff." (Am. Compl.

¶ 88.)[8] The equitable doctrine of unjust enrichment sounds in quasi-contract – a contract implied

in law. Sevast v. Kakouras, 915 A.2d 1147, 1153 n.7 (Pa. 2007). The gist of the action doctrine

does not apply to causes of actions based upon implied or constructive contracts. JK Roller

Architects, L.L.C. v. Tower Inv., Inc., No. CIV.A.02778, 2003 WL 1848101, 1 (Pa. Com. Pl.

Mar. 17, 2003). Accordingly, the court will not bar Plaintiff's unjust enrichment claim against

Defendants Prime and Dumpster Direct based on this doctrine.

### 4.    Civil Conspiracy Claim

In Count IX, Plaintiff alleges that Defendant Goverdhanam conspired with unknown

Defendants John Doe 1 and 2 and Jane Doe 1 and 2 to launch a competing online enterprise

using the business model and confidential information Goverdhanam purportedly stole from

Plaintiff. (Am. Compl. ¶ 151.) Specifically, Plaintiff contends that Defendant Goverdhanam

---

[8] Notably, "the quasi-contractual doctrine of unjust enrichment [is] inapplicable when the relationship between parties is founded on a written agreement or express contract." Farm Credit Leasing Servs. Corp. v. Ferguson Packaging Mach., Inc., No. CIV.A.07-1900, 2007 WL 4276841, at *10 (E.D. Pa. Dec. 3, 2007) (quoting Benefit Trust Life Ins. Co. v. Union Nat. Bank of Pittsburgh, 776 F.2d 1174, 1177 (3d Cir. 1985)). Though Plaintiff appears to base its claim solely upon Defendants' alleged violation of the express contracts between the parties, Defendants have not explicitly admitted that they were subject to the terms of the alleged service contract. Where the parties do not agree on the existence of an enforceable contract, it is improper for the Court to dismiss the unjust enrichment claim at this stage of the pleadings. See Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 507 (E.D. Pa. 2008) (where parties do not agree on the existence of an express contract, the Federal Rules of Civil Procedure permit pleading in the alternative and allow a breach of contract claim and unjust enrichment claim to coexist during the early stages of the litigation); Cornell Cos., Inc. v. Borough of New Morgan, 512 F. Supp. 2d 238, 266 n.19 (E.D. Pa. 2007) ("Promissory estoppel and unjust enrichment may be pled in the alternative to a breach of contract claim, although the finding of a valid contract would prevent a party from recovering for either quasi-contractual theory.") (citation omitted). Therefore, at this time, the Court will not dismiss Plaintiff's unjust enrichment claim based on the alleged existence of an express contract between the parties.

entered into agreements with these unnamed Defendants to obtain $2 million in funding for his operation. (Id.) Plaintiff also alleges that Defendant Goverdhanam's wife, Rabika Gullapalli, conspired with him to carry out this plan, and that Ms. Gullapalli, named as a co-conspirator but not a defendant, is a member and employee of Defendant Service Direct. (Id. ¶ 152.) Finally, the Amended Complaint avers that Defendants Goverdhanam and the Does, along with Ms. Gullapalli, have conspired to carry out the aforementioned cyber-attacks against Plaintiff's website. (Id. ¶ 153.)

A cause of action for civil conspiracy requires a distinct underlying tort as a predicate to liability. In re Orthopedic Bone Screw Prods. Liab. Litig., 193 F.3d 781, 789 (3d Cir. 1999); Kist v. Fatula, No. CIV.A.06-67, 2007 WL 240721, at *9 (W.D. Pa. Aug. 17, 2007). "Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means of establishing vicarious liability for the underlying tort." Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 407 (3d Cir. 2000) (quotation omitted).

Defendants argue, without elaboration, that Plaintiff's conspiracy claim is redundant of its breach of contract claims and therefore barred by the gist of the action doctrine.[9] (Defs.' Mot. Dismiss 10.) While the Court has dismissed all underlying common law tort claims against Defendant Goverdhanam, Plaintiff's claims against Goverdhanam under the Stored

---

[9] Given that conspiracy liability derives wholly from an underlying tortious act, the Court assumes that Defendants move for dismissal of the conspiracy claim based on the view that the underlying tort claims against Defendant Goverdhanam are redundant of Plaintiff's contract claims.

Communications Act and Computer Fraud and Abuse Act still stand.[10] Defendants have neither explained why these statutory claims would be redundant of Plaintiff's contract claims nor challenged these alleged violations as proper underlying grounds for Plaintiff's conspiracy claim. Accordingly, the Court declines to dismiss the claim at this time.

## V. CONCLUSION

For the foregoing reasons, the Court denies Defendants' Motion to Dismiss Plaintiff's claims under the Stored Communications Act and Computer Fraud and Abuse Act. Similarly, the Court denies Defendants' Motion to Dismiss Counts III (unjust enrichment), IV (conversion), and IX (conspiracy). Given the Court's finding that these claims fulfill the pleading burdens of Rule 12(b)(6), Defendants' Motion for a More Definite Statement is also denied. The Court grants Defendants' Motion to Dismiss Counts V (fraud), VII (fraud and intentional misrepresentation), and VIII (negligent misrepresentation) because they are redundant of Plaintiff's contract claims and therefore precluded by the "gist of the action" doctrine.

An appropriate Order follows.

---

[10] Notably, Defendants have also failed to challenge Plaintiff's claim against Goverdhanam under the Pennsylvania Uniform Trade Secrets Act, 12 PA. CONS. STAT. § 5302 ("PUTSA"). Such a violation, however, cannot serve as a basis for Plaintiff's conspiracy claim. Even if the Court were to later find that Plaintiff's PUTSA claim has merit, the statute expressly "displaces conflicting tort, restitutionary and other law of this Commonwealth providing civil remedies for misappropriation of trade secret," and would therefore preempt Plaintiff's conspiracy claim. 12 PA. CONS. STAT. § 5308. In contrast, the SCA and CFAA do not yield such clear preemptive language, nor have Defendants raised this issue in their Motion. Consequently, without engaging *sua sponte* in a full analysis of the legislative intent of these statutes, the Court cannot dismiss a conspiracy claim based upon Defendants' alleged violations of the SCA and CFAA. See, e.g., Johnsrud v. Carter, 620 F.2d 29, 33 (3d Cir. 1980) (stating that the purpose of Rule 12(b)(6) is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).