IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INTEGRATED WASTE SOLUTIONS, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO.  10-2155 |
| SUDHAKAR GOVERDHANAM, et al. | : | |

MEMORANDUM AND ORDER

JACOB P. HART
UNITED STATES MAGISTRATE JUDGE                                                                July 13, 2012

      On May 10, 2012, the parties in the above captioned case appeared before the undersigned for a conference and reached an agreement to settle the case.  Although the parties have not yet executed a written agreement, on that date, the terms of that agreement were set forth in detail on the record "the Agreement".  Tr. 5/10/12.  Part of the Agreement required that Defendant transfer certain assets pertaining to the dumpster business to Plaintiff by May 12 at 5:00 pm.  An agreement regarding the specific assets to be transferred had been worked out between Mr. Goverdhanam and Mr. Rundatz, an IT professional who works for Plaintiff on nights and weekends helping with specific issues.  N.T. 6/12/12 at 33-34.  Mr. Rundatz placed the list of 9 items, as they had agreed, on the record and Mr. Goverdhanam then had a chance to respond.  Tr. 5/10/12 at 17-18.  Presently before the Court is Plaintiff's Motion To Enforce and Impose Damages.  The alleged breaches all involve Defendant's alleged failure to produce certain assets set forth on that list by the 5:00 pm deadline on May 12, 2012.  Plaintiff alleges that Defendant materially breached the agreement and seeks the award of $150,000 pursuant to the liquidated damages provision of the agreement.

Plaintiff also originally asked that the Court direct Plaintiff to transfer certain items, which at the time of the hearing had already been transferred, making their request moot. In light of the alleged breaches, Plaintiff also asked that the Court accelerate Defendant's transfer of theservicedirect.com, as opposed to the scheduled transfer on July 9, 2012.  Given that July 9, 2012 has passed, this request is also moot.  Although Plaintiff raised other issues, Mr. Thall made it clear at the hearing that he was limiting his arguments to Defendant's failure to turn over dupsterdirect@gmail.com, failure to turn over directdumpster@gmail.com, failure to turn over LinkedIn social media account, failure to turn over usable customer, vendor or order data,  failure to turn over the source codes and finally the fact that access to accounts was restricted.  N.T. 6/13/12 at 15-16; Exhibit P-1.

After conducting a hearing over the course of two days, during which argument and testimony was presented by both sides, the Court makes the following findings:

Failure to Turn Over E-mail Accounts and to Remove Restrictions:

The fifth item listed on page 17 of the transcript provides that the Defendant provide "the login and password for all email addresses associated with the sites." Tr. 5/10/12 at 17.  Plaintiff alleges that Defendant failed to transfer the email account dumpsterdirect@gmail.com and refused to acknowledge its existence until May 17, 2012, five days after the transfer date set forth in the Agreement.  Plaintiff also claims that Defendant failed to transfer the email account directdumpster@gmail.com.  According to Plaintiff, it was only after they confronted Defendant that the account was transferred on May 18, 2012, six days after the deadline and by that time AdWord campaigns had been removed and were not transferred.

According to the testimony, these two email accounts were created for the purpose of managing Google accounts.  As per Plaintiff's P-1, Plaintiff agrees that dumpsterdirect@gmail.com was used to control the domain and websites and directdumpster@gmail.com was used to market the websites via Google adwords.  While a gmail account is a form of an "email" account, we find credible Defendant's testimony that in this case the accounts were created simply because a Google email account or gmail account was required by Google to run and manage their adwords and Google analytics.

The entrance to the Adwords account was by a gmail account.  It was not an e-mail account for customers or vendors. According to Defendant, because the account was used for overall business including porta-potties and fences and was not a dumpster account, Plaintiff was not entitled to the username and passwords.  Defendant testified that the account was used to manage his Google accounts for all of his businesses including dumpsters, porta-potties and fences, but they were not used in the dumpster business to send or receive emails to or from customers or vendors.  N.T. 6/13/12 at 26-29.  Given that we accept this testimony, we find that the transfer of the two accounts were not included under the fifth item in the transcript. Therefore, Plaintiff was not required to give Defendant the accounts.  Rather, under item #9, they were entitled to a data dump from the account, as was provided.  Tr. 5/10/12 at 18; N.T. 6/13 at 24.

The accounts were simply keys to access the Google Adwords accounts, but did not receive or send e-mails for the dumpster business.  Id. at 28.  However, by May 18, 2012, although we find they were not required to do so, Defendant transferred both accounts. Therefore, we do not find a breach of the agreement, material or otherwise, related to the

3

Defendant's failure to turn over the two gmail accounts by the deadline.  <u>See</u> <u>Pure Earth, Inc. v. Call</u>, Civ. A. No. 09-4174, 2012 WL 947027 at *49 (E.D. Pa. March 21, 2012) *citing* <u>Oak Ridge Constr. Co. V. Tolley</u>, 504 A.2d 1343, 1348 (Pa. Super. 1985) (listing factors to consider in determining if breach is material); <u>see</u> also Restatement 2d of Contracts § 241.

  Pursuant to seventh and eighth items listed in the Agreement, Defendant was to produce the login and password to the Google webmaster tools and the login and password to Google Analytics.  Tr. at 17.  Plaintiff argues that although Defendant had turned over the logins and passwords to the restricted account dumpsterdirectrental@gmail.com, he did not turn off security measures so Plaintiff was still unable to log in to the account.  N.T. 6/12/12 at 49.  Plaintiff acknowledges that Defendant gave them the accounts by the deadline set forth in the Agreement, but claim that they were given only restricted access to sites.  N.T. 6/12/12 at  46.  Plaintiff alleges that defendants retained ownership of the domain names and they were not able to make any changes to the accounts.  Once they were given the gmail accounts, the account access was still restricted because of security questions.  They assert that IWS could not claim ownership of the accounts that were transferred because the accounts were set up with security restrictions that were not eliminated.  However, Plaintiff admits that they were able to gain access to the accounts by guessing the answers to security questions.  They "guessed" the answers to the questions instead of contacting the Defendant for the information and ultimately gained access.  The security question required that an Indian cell phone number be entered and the cell phone number had not been disclosed to plaintiffs.  <u>Id.</u> at 50.  Rather than contacting Defendant, Mr. Rundatz was able to get into the account by changing the security question and entering information that he remembered discussing with Mr. Goverdhanam.  <u>Id.</u>  Once again, there was no material

breach.  Furthermore, as to Plaintiff's claim that the access was still as co-owners, although they may not have been required to, Defendants have now fully relinquished control of these accounts.

Failure to Turn Over LinkedIn Social Media Account:

Next, Plaintiffs allege that Defendant materially breached the agreement by failing to turn over all social media accounts related to the dumpster business by the deadline, as was required by the sixth item set forth on the record.  Tr. 5/10/12 at 17.  There is no dispute that by the deadline defendants turned over to the plaintiffs their Facebook and Twitter accounts and did not turn over a LinkedIn account until six days later on May 18, 2012, after being contacted by Plaintiff.

According to Mr. Goverdhanam, they did not know that they had a LinkedIn account until they were notified by Plaintiff on May 17th or 18th.  He went to his marketing manager when he was informed of the account and they discovered that the account had been created by a former employee, who had been in the marketing department.  They located the former employee in India, figured out the username and password, and gave the information to Plaintiff the same day.  N.T. 6/13/12 at p. 38.  We find Mr. Goverdhanam's testimony stating that the failure to initially disclose the LinkedIn account was not intentional or malicious to be entirely credible.  Since the failure to include this account was not intentional and based on the fact that it was quickly turned over after they discovered it, we once again do not find a material breach.

Failure to Turn Over Usable Customer, Vendor or Order Data

Plaintiff asserts that Defendant failed to provide the customer, vendor and order data in a

5

usable format. Plaintiff argues that they asked for accounting files and were told that they could not be provided. They reference a conference call with the Defendant's accounting program vendor in which they discussed the logistics of transferring the files and note that Defendant refused to transfer the entire accounting program because the data would have included the data related to their non-dumpster related business. Exhibit P-1. However, the settlement as placed on the record did not provide for "accounting files". Rather, the third item set forth as part of the description of assets to be transferred states that Defendant was to provide a "copy of databases, including all customers, all vendors, all orders". Tr. 5/10/12 at 17.

In June 2011, Defendant stopped using NetSuite and began using Methods accounting. Therefore, when they produced the data for the different time periods, it was extracted from the different systems. By the deadline on May 12, the Defendants produced to Plaintiff Excel spreadsheets of data including lists of customers, vendors and orders, which was extracted from NetSuite (the data that predated June 2011) and Excel spreadsheets which were extracted from Methods (covering June 2011 to present). Then, in an attempt to please Plaintiff, on May 27, Defendants provided the Methods data in QuickBooks format. Rather than transferring the entire accounting information through the vendor, Defendant did so after attempting to remove its non-dumpster related entries. According to Plaintiff, this latest submission has been most "usable." N.T. 6/ 12/12 at 129.

During the hearing, in an attempt to show that Defendant did not comply with the third item listed on page 17 of the transcript, Plaintiff's counsel asked Mr. Goverdhanam to show him where on the documents provided on May 12 it tells him "what was purchased, what did the vendors' purchase order show, the amount of money involved, the dumpster, the address it was

to go to, the amount of time it was to be there, the tip fees." N.T. 6/13/12 at 67.  In response, Mr. Goverdhanam testified that it was his understanding that pursuant to the Agreement, he was to produce vendor lists, customer lists and sales order lists by May 12.  Id.  He further testified that if he was to produce the additional information from Methods as they ultimately did in Quickbooks, he would not have agreed to do so by the deadline.  Id.  Defendant produced the Quickbooks data on May 27, giving Plaintiff customer orders and vendor purchase orders.  However, Plaintiff attempts to use the fact that the data was ultimately produced to demonstrate that Defendant concedes that it was required to be produced by the deadline.  Id. at 69.

It is undisputed that the agreement did not require that the data be produced in any particular format.  Id. at 129-130.  The issue Plaintiff is arguing is that the data provided by the deadline was not "usable", in part because it is inaccurate.  Plaintiff argues that the data was "skewed" and was the same skewed data that defendants provided to them in .pdf format in response to Judge Yohn's order in 2010.

Plaintiff explained that part of the reason they did not consider the data provided originally to be reliable or usable was the differences in the numbers of entries between what was originally provided and that which was provided on May 27.  Id. at 124.  There were less orders on the newer data and many more customers.  Id.  Plaintiffs did not contact Defendants after May 27 to ask for an explanation for the differences.  Id. at 155-156.  When asked at the hearing why the numbers varied so much as to the customers, Defendant testified that Quickbooks adds every prospect or lead to the customer list.  This is why when the data was synced from Methods to Quickbooks, which is an automatic process, the number of "customers" was so much larger.  Id. 188.  Mr. Goverdhanam explained that usually only about eight to ten percent of the prospects

actually become actual "customers". Id. at 188-189.

Plaintiff also argues that entries appear to be missing from the lists. They claim that the unreliability of the data was evident because they had received calls from customers or vendors which they were unable to find on the lists provided by Plaintiff. Id. at 74-75. They assert that there were "holes" or missing data. Id. at 121-122. Plaintiff referenced as an example an order that was placed for dumpsters for Joseph Haslan. Id. at 12. Mr. Rundatz testified that two orders were placed by Mr. Haslan and the data provided by Defendant showed one record. Id. at 61. Mr. Goverdhanam testified that when he looked he did not find a customer called Joseph Hanlan. N.T. 6/13/12 at 74. It is not evident whether this discrepancy is simply a result of missing data or a function of the manner in which repeat customers are listed, as defense counsel attempted to hint. N.T. 6/12/12 at 125. Defendant has not explained this missing information.

Another example Plaintiff uses to demonstrate the unreliability of the data is the discrepancy between the amount alleged to be owed pertaining to an account with a hauling company called Knight Hauling. Defendant testified that the explanation for this difference is that Knight Hauling and their company have a dispute about invoices. They had gone through check by check showing Knight Hauling what invoices were paid and there is still a dispute remaining as to one invoice which Knight Hauling claims that Defendant still owes them. N.T. 6/13 at 8.

It is clear that especially the vendor data which pre-dates June 2009, contained in the file vendordetails_2009-june2011.xlsx, contains incorrect information, with the phone numbers, addresses, and particularly counties as listed on the Excel spreadsheets being incorrect. (Example- N.T. 6/13/12 at 55). Defendant agreed that the data was not accurate. In fact, Mr.

Goverdhanam testified "It's not accurate, it's not supposed to be accurate. We went real quick, collected almost 5/6,000 vendors throughout the country. Many duplicates, many errors." Id. at 56. He went on to state: "But the goal was not to get a perfect 5,000 letters [vendors], the goal was to get – let's get a subset, so when we get an order we use this subset, use this list, to then fine tune and find the actual vendor." Id.

Defendant testified that in the earlier years the list of vendors was compiled by customer service representatives located in India simply going onto Google or the yellow pages and entering information or raw data. N.T. 6/12/12 at 176-177. The vendor data was compiled from computer research and uploaded to NetSuite. N.T. 6/13 at 53. When they used the vendors, they actually called them and got more details and accurate information. Id. at 54. Defendant's counsel asserted that as a result of this process, the newer data, meaning the vendors listed from June 2011 to date (vendordetails_2011-TillDt.xlsx) was more accurate than the older list (vendordetails_2009-june2011.xlsx).

After reviewing the binder containing the printout of these files, we agree that the newer file seems to contain "usable" or accurate information, unlike the "skewed" data that was addressed during the hearing from the earlier time period. Both of these spreadsheets (pre-June 2009 and June 2009 to date) were presented by the due date. Therefore, as of the deadline set forth in the agreement Plaintiff was provided with the vendor list that Defendant was using on their new system. After taking a random sampling of 15 of the vendors listed and looking them up on the internet, it appears that all but one of the entries was mostly accurate, containing the correct address and phone numbers for the vendors. In sharp contrast to our review of the earlier vendor data, any errors were minor and certainly do not appear to be "skewed". For example, the

9

entry on line #168 contained the correct phone number and state, but the wrong postal code.

After reviewing the data that was presented and considering the arguments and hearing testimony, we find that although some of the data is not "usable", Defendant did not materially breach the agreement.  Defendant testified that this vendor data was the same data that they used while conducting business.  N.T. 6/13 at 60.  While it is clearly inaccurate and inefficient, Defendant could not be expected to hand over to Plaintiff better records than they maintained and used themselves.  Furthermore, they produced to Plaintiff by the deadline the newer file, which as explained above, is more accurate and certainly much more "usable".  As to the customer and order lists, there is no evidence that Defendant withheld or omitted anything from the data provided.  Defendant was able to explain the variance in the numbers of customers between the lists provided.  Furthermore, in an attempt to not only comply with the language set forth in the Agreement, but to give Plaintiff what it needs to operate its business, Defendant as of May 27 has now given Plaintiff the data which was automatically transferred from Methods in the Quickbooks format, as it was maintained and used by Defendant, minus only the non-dumpster entries.  We do not find a material breach of the Agreement and will not penalize Defendant for its reluctance to submit its entire Quickbooks including the porta-potty entries.  It is clear that it was the understanding of the parties that only dumpster business was to be transferred.  Given that the Agreement did not specify that the data be produced in that format, Defendant will not be penalized for taking additional time to delete those entries before providing it to Plaintiff.

<u>Failure to Turn Over Source Code to dumpsterdirect.com, directdumpsterental.com, dddumpsterrental.com, and haulerdirect.com</u>

Finally, Plaintiff alleges that Defendant breached the Agreement by failing to turn over the source codes to dumpsterdirect.com, directdumpsterental.com, dddumpsterrental.com, and haulerdirect.com by May 12, 2012 in accordance with item fourth item set forth on page 17 of the transcript setting forth the terms of the Agreement.  According to Mr. Goverdhanam, they gave a data dump containing the "code" of the whole site, but it did not contain the actual ".cs" files or source codes.  He testified that it was a "clerical error".  N.T. 6/13/12 at p. 42.

It is undisputed that without the actual source codes Plaintiff was not able to make changes.  Plaintiff testified that they did not receive the source codes until May 25, 2012, thirteen days after the deadline.  However, Plaintiff did not discover that the source codes were missing and notify Defendant until that date.  Plaintiffs acknowledge that after they contacted Defendant on May 25, Defendant provided the source codes to Plaintiff only 8 hours later.  N.T. 6/13/12 at 45.

Once again, while the specific code files were missing, there was an attempt to comply with this part of the agreement.  Given the fact that the error was not discovered until May 25 and the codes were provided very quickly thereafter, Plaintiff simply suffered no damages and we once again do not find a material breach.

<u>Conclusion</u>

In conclusion, we find that while there have been problems with some of the data and other assets provided, overall it seems that Defendant has and continues to attempt to comply

with the terms of the Agreement in an effort to keep the case settled.  Some of the difficulty has occurred as a result of the accounts being meshed with the other aspects of Defendant's business and the need to separate out the porta potty and fence business.  However, in many instances, Defendant has complied with the additional requests made by Plaintiff by producing additional data and transferring accounts even though it did not believe they were part of the Agreement.  In many cases, this was done very quickly, especially considering that it has required contacting individuals in India. An example of the Defendant's good faith in complying with the terms of the Agreement is the fact that as of the hearing date, Defendant was still paying for hosting even though they are clearly not required to do so under the Agreement.  N.T. 6/13/12 at p.11-12.  We do not find that there have been any material breaches of the Agreement and will not award damages.  6

      We note that Defendant argued that the Court lacks jurisdiction to impose the $25,000 penalties contemplated in the Agreement unless they pertain to a "revenue" item.  However, we need not address their argument that the damages apply only to revenue items or their claim that this provision is an unenforceable penalty, as we find no material breaches.

      Therefore, I enter the following: